BIMELER, (GOESELE v.) See Case No. 5,-503.

# Case No. 1,411.

## In re BINFORD.

[3 Hughes, 295; [1] 17 N. B. R. 353.]

District Court, E. D. Virginia. April 3, 1878.[2]

CONDITIONAL SALE—VALID STIPULATIONS — POSSESSION OF GOODS—PRESUMPTION—FIXTURES.

1. Where a sale of goods is made on condition that the title of the vendor is not to pass until the purchase-money shall be paid, and the goods are delivered to the vendee: *Held*, that such a stipulation is valid; and, if all taint of fraud is disposed of, a subsale of the goods by the vendee, before payment in full to the vendor, will not affect the title of the original vendor.

[See Blackwell v. Walker, 5 Fed. 419.]

2. The possession of goods does not of itself carry along with the property in them, nor of itself indemnify the real owner of them.

3. In Virginia the possession of the fixtures and outfit of a tobacco manufactory does not create the presumption that the title to them is in the person using them.

[In bankruptcy. John J. Binford excepts to the report of the register of the liens and their priorities binding on the estate of Charles T. Binford, a bankrupt. The exceptions were sustained.]

HUGHES, District Judge. This is a contention between John J. Binford, of Richmond, and Dohan, Carroll & Co., of New York, as to which shall be paid in full their claim against John H. Greanor out of the proceeds of the sale of certain property of the bankrupt [upon which the two parties claim liens.][3]

I think the facts of the case are as follows: It seems that certain tobacco-manufacturing fixtures and property were sold by Cook & Laughton, auctioneers, at auction, in Richmond, on March 11th, 1873. They were

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [Reversed by the circuit court in Case No. 1,411a.]

[3] [From 17 N. B. R. 353.]

paid for by John J. Binford in cash; the whole price of the goods purchased amounting to five thousand two hundred and thirty-nine dollars and sixty-four cents. In making up that sum, Binford used a note of John H. Greanor for one thousand three hundred and sixty dollars, given him by Greanor for the purpose. Binford had this note discounted on his own credit, as a means of making up the amount of cash purchase-money due for the goods. There was immediately afterwards another transaction in respect to this specific property. Greanor and his son-in-law, Charles T. Binford (who was the son of John J. Binford), were tobacco manufacturers. I believe the evidence shows that at that time Charles T. Binford was in the employment of Greanor. At all events, it is very plain that John J. Binford's purchase of the property in question was made as a means of aiding his son Charles in business. These being the social relations subsisting between the three men, John J. Binford and John H. Greanor, immediately after Binford's purchase of the property, made an agreement with each other that Greanor should take charge of the property, and use it for the purpose of carrying on the business of a tobacco manufacturer; that he should pay John J. Binford for the property the price which it had cost at auction; and that John J. Binford should continue to be the owner of the property until Greanor should complete, by payments made from time to time, the reimbursement to Binford of the purchase-money. Greanor was to pay as rent for the property a rate equal to eight per cent. of the amount due to Binford. This understanding may have been had, and probably was had, before the time of the auction sale. At all events, Greanor, who understood what ought to be the value of the several articles sold, did the bidding at the sale; Binford, not being a tobacco manufacturer, not himself making the bids. The account of the auctioneers was made out against Binford; and the purchase-money was paid by him. Greanor thereupon went into the business of manufacturing tobacco, using the outfit which had thus been supplied by John J. Binford.

I will here remark that it is quite customary in Richmond, and other Virginia cities and towns, for tobacco fixtures and other property used in the tobacco manufacture to be used by manufacturers who are not themselves owners of such outfits; and that the possession of such property by manufacturers does not and is not taken to imply ownership; and that the using of such property by persons not owning it does not raise a presumption of fraudulent intent. As appears in this case, these outfits are quite costly; and it is not for the interest of trade, and it is not the policy of the law, to require the ownership of such property to attend the possession, and to identify the real owner.

Greanor went on with the business of manufacturing tobacco in Richmond, with the use of this property, from March, 1873, to February 11th, 1876. During that interval of time he made payments to John J. Binford, at different dates down to November 20th, 1875, of such sums as left the balance then due at the amount of one thousand five hundred and fifty-eight dollars and seventy-two cents. No bill of sale or writing had ever passed from Binford to Greanor in regard to this transaction; no paper of any sort was put on public record; and now the amount due to Binford is about one thousand seven hundred and thirty-one dollars and thirty-one cents. On the 11th of February, 1876, Greanor, having occasion to settle an old debt due to, and to borrow additional money from, the firm of Dohan, Carroll & Co., of New York, made a deed of trust, by which he conveyed the property which had been procured for him by Binford as has been described, and some other property in his tobacco factory, to a trustee in trust to secure the payment of fifty-five hundred dollars to the New York firm. No mention was made at the time to Dohan, Carroll & Co. of the title of John J. Binford; and no mention of this deed was made to John J. Binford, who remained ignorant of its existence until the following April. On the 15th of April, 1876, Greanor made a sale and deed of assignment, by which he conveyed to his son-in-law, Charles T. Binford, all the property which he had previously transferred by deed of trust for the benefit of Dohan, Carroll & Co. The consideration of this transfer to Charles T. Binford was the latter's undertaking to pay off debts of Greanor to the amount of eight thousand eight hundred and five dollars and thirteen cents, as shown by a schedule attached to the deed of assignment, in which schedule it appears that five thousand dollars was then due to Dohan, Carroll & Co., and one thousand five hundred dollars due to John J. Binford. Greanor's deed of assignment to Charles T. Binford made mention of the deed of trust which had been executed in February preceding for the benefit of Dohan, Carroll & Co.; and of the fact that the claim of John J. Binford was "secured by title retained to nearly the whole of said property except the engine and boiler;" that is to say, the property used by Greanor in his tobacco factory, and embraced in the terms of the deed of trust.

After this assignment, Charles T. Binford went on with the business of manufacturing tobacco until his bankruptcy, which occurred on the 8th November, 1877. At an early stage of the bankruptcy, the property which is the subject-matter in which the present contention originated was sold by consent, under an order of this court, and the proceeds of sale not being sufficient to pay off in full the two claims of John J. Binford, and of Dohan, Carroll & Co., the question now to be determined is, which is entitled first to

be paid? it appearing from the register's report that one thousand seven hundred and thirty-one dollars and thirty-one cents is the amount due to Binford; and four thousand four hundred and seventy-three dollars and ninety-six cents the amount due to Dohan, Carroll & Co.; while the fund applicable to these two claims only amounts to five thousand three hundred and eighty-three dollars and two cents.

The real question is as to the title and ownership of the property on the 11th February, 1876, when Greanor made his deed of trust in favor of Dohan, Carroll & Co. Was it Greanor's property, and had he power to make title to it in prejudice of the right of John J. Binford to be paid what was due him under the agreement which had been made between himself and Greanor in March, 1873? I can see no taint of fraud in the transaction of March, 1873. Indeed the character of the parties is such as to forbid the surmise of any intentional fraud. The transaction was a natural one, growing spontaneously out of their personal relations to each other. There is no feature in it which suggests the imputation that it was intended to delay, defraud, or hinder creditors in their rights. From motives of affection which do him honor, Mr. Binford had bought the property constituting the outfit of a tobacco manufactory, and paid for it. He had bought it, not for his own use, tobacco manufacturing not being his business, but for Greanor, with whom his son was associated in that business. Both Greanor and his son were without capital, and probably without credit; a thing not unusual with tobacco manufacturers, whose trade is subject to great vicissitudes. He therefore gave Greanor the use of this outfit for his business, in a manner to show that he did not desire to make profit on his transaction; but only sought, while putting Greanor on his feet in business, to incur no loss by his act. The requirements of Davis v. Turner, 4 Grat. 422, and of Curd v. Miller, 7 Grat. 187, are fully satisfied by the evidence taken in the case.

I see nothing illegal in the contract or agreement which J. J. Binford made with Greanor. The property was his by purchase. It was competent for him to lend or hire it to Greanor. It was competent for him (and not unusual in like cases in Virginia) to hire Greanor this outfit for manufacturing tobacco, upon the terms which were in fact agreed between them. By that agreement the title to the property was not to pass from Binford to Greanor until Greanor should have fully paid for it. And, if it was competent for the two men to stipulate that until the whole purchase-price was paid the title should remain in Binford, then the title remained in Binford until the last cent was paid. The authorities are conclusive on the right of a vendor to stipulate for a retention of title, after surrender of possession, until the performance of conditions agreed upon

as precedent to the passing of the title. The last I have observed is that of Fosdick v. Schall, 99 U. S. 235. The first case I know of in which this principle was laid down was that of Mires v. Solebay, 2 Mod. R. 243. There the title had been reserved after the delivery of a flock of sheep until the vendee should at a certain day pay the purchase-price. The vendor made a second sale before payment, and the sale was held to be good against the first vendee. That was a stronger case for the defendant than the one at the bar, because it was the person in Binford's place whose sale was held to be valid, and not the person in Greanor's place.

Benjamin, in his work on Sales, treating of sales of personal property, says: "Sec. 320. Third rule.—To these may be added, where the buyer is by the contract bound to do anything as a condition either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods have been actually delivered into the possession of the buyer. Where there is a condition precedent attached to a contract of sale and delivery, the property does not vest in the purchaser on delivery, nor until he performs the condition or the seller waives it, and the right continues in the vendor even against creditors and subsequent purchasers of the vendee. 2 Kent, Comm., (12th Ed.) p. 497, note 1, and numerous cases there cited; 27 Mo. 45; 7 Blatchf. 548, [Bauendahl v. Horr, Case No. 1,113;] 2 Pick. 512; 2 Hill, (N. Y.) 326; 4 Hill, (N. Y.) 449; 18 N. Y. 552; 114 Mass. 376; 3 Thomp. & C. 380, 644. Where these goods are sold at a fixed price, to be paid on a certain day, and delivery is made upon an agreement, express or implied, that until the price is paid the title is to remain in the vendor, payment is a condition precedent, and, until performance, the property is not vested in the purchaser. 7 Gray, 155, 158; 4 Vt. 558; 25 Mich. 48; 8 Gray, 158; 18 Vt. 182; 9 N. H. 298; 15 Gray, 225; 24 Vt. 55; 12 N. H. 298; 4 Cush. 195; 22 Vt. 203; 11 N. H. 230; 1 Rice, 121; 45 Vt. 118; 12 Ired. 268; 98 Mass. 149, 150; 38 Vt. 448; 103 Mass. 522; 8 Vt. 151. And such agreement is valid, though the goods were not in existence so as to be a subject of bargain and sale when the agreement was made, if, when delivered, they were delivered under the agreement. 114 Mass. 376. The vendor in such cases may reclaim the goods, where the price has not been paid, even from one who has purchased them or taken a mortgage of them from this vendee in good faith and without notice. 98 Mass. 149; 3 Gray, 545; 40 N. Y. 314; 114 Mass. 376; 5 Gray, 306; 45 N. Y. 499; 109 Mass. 376; 8 Gray, 241; 79 Pa. St. 488; 15 Kan. 600; 49 Me. 219; 46 Ill. 319; 25 Mich. 48; 45 Vt. 4, 18, 118, 122. Good faith does not aid the purchasers in such cases, because their vendors, having no title

to the property, could convey none. Such purchasers hold the same legal condition as do bona fide purchasers of stolen goods. 8 Gray, 159, 160."

In Connecticut, where, as throughout New England, the law of sales has been most diligently studied, in the case of Forbes v. Marsh, 15 Conn. 384, Williams, C. J., used the following language: "In this class of cases the vendee comes into possession of property which was known to belong to another man. Whether, therefore, the vendee had borrowed it, or hired it, or purchased it, becomes a matter of inquiry, and ought to be ascertained by him who proposes to trust his property upon the faith of this appearance; for the law offers its protecting shield to those who attempt to protect themselves. Accordingly, we find that all these cases of conditional sales, made bona fide, have been held good against attaching creditors, as well as between the parties. In the cases above cited from New York and Massachusetts, Strong v. Taylor, 2 Hill, 326; Hussey v. Thornton, 4 Mass. 405; and Barrett v. Pritchard, 2 Pick. 512, the claim was made by creditors. So, too, in the cases of Vincent v. Cornell, 13 Pick. 294; Fairbank v. Phelps, 22 Pick. 535; and Patten v. Smith, 5 Conn. 201, the same principle was recognized, though the cases may have been determined on other points."

Nor is the law thus laid down contrary to good morals or public policy. I conclude, therefore, on the strength of these authorities, that the title in the property which Binford purchased on the 11th of March, 1873, and then delivered to Greanor, was still in Binford when Greanor made his deed in favor of Dohan, Carroll & Co., on the 11th of February, 1876.

And the next question is, whether that deed could have the effect of defeating John J. Binford's title in the property, which by his agreement with Greanor was not to terminate until after all the purchase-price, which had been agreed to be paid by Greanor, had been paid. As to the legal title, the property was still Binford's on the 11th of February, 1876. Did or could Greanor's deed of that date have the effect of conveying the property, in prejudice of Binford's title? I think not, for very plain reasons. It is an elementary principle of law that "nemo dat quod non habet." The title to this property was not in Greanor, and he could not convey a title which was not in him. The finder of lost property cannot, by sale and delivery, pass away the title of the owner who lost it. The thief who has stolen property cannot, by sale and delivery, convey it to a person who buys it from him and pays him full value. There is no principle more clearly settled in the law of all countries than the principle that the mere possession of personal property does not confer title. In England an exception to the general rule in regard to markets overt and the city of Lon-

don prevails; but these exceptions are not allowed in this country. The rule of caveat emptor holds universally with us in regard to personal property. In the interest of commerce, certain forms of choses in action, "payable to bearer," are held to pass by mere delivery; but I know of no instance in which specific property, not owned by the person in possession, has been held to have been validly sold and transferred by him in prejudice of the real owner.

There have been a few cases in the English courts, in which it has been intimated that sales by persons holding property not their own, where these persons have held and passed the muniments of title to the property (such as bills of lading), might perchance be good, but there are no definite, authoritative decisions establishing even these exceptional cases. The cases leaning most strongly in favor of such an exception are those of Boyson v. Coles, 6 Maule & S. 14; McGregor v. Thwaites, 3 Barn. & C. 24; and Williams v. Barton, 3 Bing. 139. In the last-named case, which was one where strong equities existed in favor of the purchasers from a person who had possession of and had sold personal property not really his own (it was a case in the English court of exchequer chamber), Mr. Chief Justice Best said: "Had I authority to alter the law, as the mode of carrying on commerce has altered, I would say that, when the owner of property conceals himself, whoever can prove a good title under the person whom the concealed owner permits to hold it, should retain that property against the owner. But this is not the law of England. Possession is not proof of property. . . . . The exception in our law (of sales in market overt by persons having property in possession) proves that if a person acquires possession of property in any mode other than in market overt he cannot keep it against the owner."

It is only where the title to property is evidenced by muniments of title, and these instruments are left by the owner in the hands of the person in possession, and that person is enabled, by these muniments of title, to hold himself out as the owner of the property, that there can even be a question whether that person can, by sale, pass title to a bona fide purchaser. A pawnee cannot, as a general rule, have a better title than the pawner, or a vendee than a vendor; and it is only where the owner of goods has lent himself to accredit the title of another person, by placing in his power those symbols of property which usually accompany and evidence the title, and has thus enabled him to hold himself out as owner and purchaser of them, that even a question can arise whether one, other than the owner of goods, can sell the title of them. A case of this sort was that of Boyson v. Coles, in 6 Maule & S. 24; and it was there held that, in spite of the equities shown in the case, the vendee of

property took only such title as the vendor held, and was bound by the rule, caveat emptor, and could not pass the real owner's title to the property. In Dyer v. Pearson, 3 Barn. & C. 42, Ch. J. Abbott said: "The general rule of the law of England is, that a man who has no authority to sell cannot, by making a sale, transfer the property to another. There is one exception to that rule, viz.: the case of sale in market overt. . . . Now, this being the rule of law, I ought (it was on a motion for a new trial) either to have told the jury, that even if there was an unsuspicious purchase by the defendants, yet as Smith had no authority to sell, they should find their verdict for the plaintiff; or I should have left it to the jury to say whether the plaintiffs had, by their own conduct, enabled Smith to hold himself forth to the world as having not the possession only, but the property; for, if the real owner of goods suffer another to have possession of his property, and of those documents which are the indicia of property, then, perhaps, a sale by such a person would bind the true owner. That would be the most favorable way of putting the case for the defendant; and that question, if it arises upon the evidence, ought to have been submitted to the jury. It is unnecessary to consider what would be the effect of the evidence upon that question." But the word "perhaps," used by the learned judge, shows that it is still a question whether possession of the property and of the documentary muniments of title, and the holding himself out as the owner, enables the holder to pass a title.

In the light of the decisions which I have noticed, I do not think there can be a doubt of the law on this subject. The title of Binford in the property in question still existed on the 11th of February, 1876. It was not in Greanor; and, therefore, Greanor's sale of the property was, in fact, only a sale of his interest in the property. It was a sale which was subject to the title of Binford; and I will therefore make a decree directing that the report of the register be confirmed, subject to the exceptions made to it by John J. Binford, which are sustained.

[Reversed by circuit court in the following case, Case No. 1,411a.]